UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
HORACE H. ABNEY,

               Plaintiff,

                                            **MEMORANDUM AND**
                                            **ORDER**

       - against -

                                            08-CV-0523 (DRH)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                     Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
**A P P E A R A N C E S :**

**CHRISTOPHER JAMES BOWES, ESQ.**
Attorney for Plaintiff
54 Cobblestone Drive
Shoreham, New York 11786

**BENTON J. CAMPBELL,**
**UNITED STATES ATTORNEY**
Attorney for Defendant
610 Federal Plaza, 5th Floor
Central Islip, New York 11722
By: Diane Leonardo Beckmann, Assistant U.S. Attorney

**HURLEY, Senior District Judge:**

*INTRODUCTION*

        Plaintiff Horace H. Abney ("Plaintiff") brings this action pursuant to 42 U.S.C.

§ 405(g) seeking judicial review of a final decision by the Commissioner of Social Security (the

"Commissioner" or "Defendant") which denied his claim for disability benefits. Presently

before the Court are Plaintiff's and Defendant's motions for judgment on the pleadings pursuant

to Federal Rule of Civil Procedure ("Rule") 12(c). For the reasons discussed below, Defendant's

motion is denied and Plaintiff's motion is granted to the extent that this matter is remanded for

further administrative proceedings.

## BACKGROUND

### I.    Procedural Background

Plaintiff applied for disability benefits on August 3, 2006. (Tr. at 55, 67-70.)[1] Plaintiff claimed that he was disabled and unable to work since January 1, 1999 due to arthritis, collapsed feet and a back condition. (*Id.* at 71-72, 94.) After his application was denied by decision dated January 5, 2007, (*id.* at 38-41), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 46-48.) A hearing was held before ALJ Seymour Raynor on October 11, 2007, at which time Plaintiff, who was represented by counsel, testified. (*Id.* at 231-63.)

ALJ Raynor considered Plaintiff's claims de novo, and on October 30, 2007, issued a decision finding that Plaintiff was not disabled since August 3, 2006, the date his application was filed. (*Id.* at 8-18.) The ALJ found that although Plaintiff suffered from severe impairments which imposed limitations, Plaintiff had the residual functional capacity to perform the full range of sedentary work. (*Id.* at 13-18.)

Plaintiff requested that the Appeals Council review the ALJ's decision. (*Id.* at 6.) By Notice dated December 4, 2007, the Appeals Council declined to review the claim, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 3-5.) Thereafter, Plaintiff timely filed the instant civil action.

---

[1]  References to "Tr." are to the Administrative Record filed in this case.

## II.    Factual Background

### A.    Non-Medical Evidence

Plaintiff was born on August 18, 1961, and obtained a general equivalency diploma ("GED") in 1999 while in prison.  (*Id.* at 34, 67, 234-35.)  He previously worked as a roofer for a construction company, a backhoe driver for a town cemetery, a commercial truck driver, a construction laborer, and a shipping and receiving clerk for a book binding company.  (*Id.* at 73, 78-85, 108.)  Plaintiff was incarcerated from 1990 to1996 and more recently from November 1998 to August 1, 2006.  (*Id.* at 63, 238, 252-53.)  While incarcerated, he obtained a chef's certificate, and worked as a chef, a clerk in the prison's auto mechanics building, and as a bathroom porter cleaning sinks and toilets.  (*Id*. at 235-38, 253-55.)  None of these positions required heavy lifting.  (*Id.* at 237, 254-55.)

In his function report dated August 21, 2006, Plaintiff reported that the pain in his ankles, lower and upper back first occurred and affected his activities on April 1,1999.  (Id. at 94.)  He stated that he presently lived with his family in a house.  (*Id.* at 86.)  During the day, Plaintiff reported that he took care of his "personal business" and did "a lot" of the household chores, including cleaning the house and cooking for his parents.  (*Id.* at 87, 96.)  When he was in pain, he would move slowly when preparing meals.  (*Id.* at 88.)  His condition did not affect his ability to care for his personal needs.  (*Id.* at 87-88.)  Plaintiff went outside as often as he could, usually alone, using public transportation.  (*Id.* at 89, 96.)  Once a week, he would attend basketball games in the park and meet friends at their house.  (*Id.* at 90-91.)  Plaintiff reported that his condition had not affected his ability to get along with others, follow instructions, pay

attention, finish what he started, stand, sit, use his hands or handle money.  (*Id.* at 90-92.)  He indicated that stress or changes in a schedule did not affect him because he would adjust to the situation.  (*Id.* at 93.)

Plaintiff testified before ALJ Raynor on October 11, 2007.  (*Id.* at 231-63.)  At the hearing, Plaintiff reported that because he had rheumatoid arthritis, bulging discs in his spine and fallen foot arches requiring the use of ankle braces, he no longer could drive a tractor trailer.  (*Id.* at 238-39, 246.)  During the day he used extra-strength Tylenol, before bedtime he took Flexeril (a muscle relaxant), and approximately three times a week, when in severe pain, Plaintiff wore a back brace.  (*Id.* at 246-48, 260-61.)  A pain management specialist and physical therapist treated him.  (*Id*. at 239, 246.)

Plaintiff stated that he lived with his parents in the basement of the house. (*Id*. at 244.)  On a daily basis, Plaintiff testified that he took care of his personal needs, prepared his own meals, cleaned, made his bed, changed the sheets, washed laundry at the laundromat with assistance from his nephews, washed his dishes, and swept his room, although he said it took him longer than a normal person.  (*Id.* at 243-45, 257-58.)  In addition, Plaintiff reported that he could open an envelope, eat with a fork and knife, hold a cup, pick up coins from a table, squeeze toothpaste onto a toothbrush, talk on a telephone and open a can with a can-opener.  (*Id.* at 258-60.)  He got along with his family and relatives.  (*Id.* at 255, 257.)  Plaintiff used public transportation.  (*Id*. at 245.)  Plaintiff went outside of his home almost every day, either to go to the store, to meet with his parole officer, or to keep his other appointments.  (*Id*. at 251-52.)

He testified that he had good days and bad days, depending on the severity of his condition.  (*Id.* at 245, 249-50.)  On good days, Plaintiff reported that he could stand

approximately one hour without needing to sit down, could sit for forty five minutes up to almost one hour before needing to switch positions, and could walk about six to seven blocks.  (*Id*.)  He could carry a two liter bottle of soda and could lift and carry less than ten pounds at any given time.  (*Id*. at 252.)  He could walk the flight of approximately ten stairs from his apartment in the basement to the first floor of his parents' house.  (*Id*. at 258-59.)  Approximately four days a week, on bad days, he can barely walk, stand or sit, even with the braces, and repeatedly has to alternate between these activities because of the extreme pain in his ankles, feet and back.  (*Id*. at 245-50.)  On these days, Plaintiff stated that he could walk only three to four blocks at a time before having to stop, rest and sit down.  (*Id*. at 250.)  Four or five times a month, Plaintiff reported that there are days he is unable to get his braces on because of severe pain and he stays in his room, usually in bed.  (*Id*. at 261-62.)

Plaintiff reported that Flexeril and extra strength Tylenol helped alleviate the pain.  (*Id*. at 260-61.)   He testified that his treating physician, Dr. Ledon, had advised him that one of his bulging discs was touching a nerve and that he might need to have either lumbar injections or surgery if his condition did not improve.  (*Id*. at 241.)  Plaintiff reported that Dr. Ledon told him that there was a 50/50 chance he could become paralyzed with lumbar spine injections.[2]  (Id. at 240-41.)

---

[2]Dr. Ledon clarified in a letter dated Octover 11, 2007 that he had told Plaintiff there was a 50% chance that lumbar spine injections could alleviate his back pain."  (*Id*. at 230.)  Dr. Ledon stated that he had not advised Plaintiff that there was a 50/50 chance of paralysis with proposed lumbar injections.  (*Id*.)

**B.**     *Medical Evidence/Treating Physicians*

**1.**     *New York State Department of Correctional Services*

A Comprehensive Medical Summary Form, prepared in September 2005 by the New York State Department of Correctional Services revealed that since 1993, Plaintiff had a history of bunionectomy[3] and since 2005, he had right spermatocelectomy,[4] bilateral foot braces and a history of left shoulder pain. (*Id*. at 111-14.) Plaintiff was prescribed Naprosyn. (*Id.*)

**2.**     *Nassau University Medical Center/ Health Care Corporation ("NUMC")*

On September 1, 2006, Plaintiff went to the NUMC's emergency department complaining of lower back, leg and ankle pain and requested a renewal of a prescription for Naprosyn. (*Id.* at 186-90.) The attending physician diagnosed musculoskeletal pain, prescribed Naprosyn, and discharged Plaintiff. (*Id.* at 186.)

On September 5, 2006, Plaintiff went to the NUMC's outpatient clinic to complete a disability form. (*Id.* at 180-85.) Plaintiff was wearing braces on his feet and had difficulty walking. (*Id.*) Dr. V. Cappello examined Plaintiff, noted that his past medical history was significant for flat feet, and recommended diagnostic studies and an orthopedic consultation. (*Id.*)

On September 7, 2006, Plaintiff went to the NUMC's orthopedic clinic complaining of pain in his lower back radiating down both legs. (*Id.* at 178-79.) The examiner noted that Plaintiff was wearing bilateral braces for pain in his legs. (*Id.*) Straight leg raising on examination produced sharp pain on the back of his right and left leg at about 80 degrees

---

[3]The excision of a bunion, *i.e.,* abnormal prominence of the inner aspect of the first metatarsal head. *Dorland's Illustrated Medical Dictionary*, 261 (30th ed. 2003).

[4]The excision of a spermatocele, *i.e.,* a cystic distention of the epididymus or the rete testis containing spermatozoa. *Id.* at 1732.

bilaterally.  (*Id.*)   The examination indicated full strength at grade 5/5.  (*Id.*)   The examiner

ordered an MRI.  (*Id.*)   Plaintiff reported that while he was in prison, his foot problem was not

being treated properly.  (*Id.*)

The following day, Plaintiff was evaluated at the physical medicine/rehabilitation

department.  (*Id.* at 175-77.)   He complained of bilateral foot pain and back pain and stated that

he wanted to apply for disability benefits because his foot deformity had left him "incapacitated."

(*Id.* at 175.)   Plaintiff stated that his foot deformity was based on the prison giving him the wrong

boots for his feet.  (*Id.*)  The examiner noted that Plaintiff was wearing circumferential ankle foot

othoses, which he felt were comfortable, could walk independently and was taking Naprosyn.

(*Id.*)   Examination by the attending physician, Dr. Walter Gandino, revealed full range of motion

in his lower extremities; full motor strength of the lower extremities with the exception of

dorsiflexion, which was 4/5 bilaterally; full motor strength throughout, with intact sensation; and

lumbosacral ranges of motion grossly within normal limits.  (*Id.* at 176.)   Straight leg raising was

negative bilaterally; feet were pronated bilaterally; and back spasm was noted with flexion to

forty degrees and extension to fifteen degrees.  (*Id.*)

On September 8, 2006, an x-ray of Plaintiff's spine revealed minimal thoracic

dextroscoliosis of the lower thoracic spine.  (*Id.* at 194.)   On that same day, blood testing

indicated a positive rheumatoid factor.  (*Id.* at 193.)

On September 22, 2006, an MRI of the lumbosacral spine showed degenerative

changes and revealed "diffuse disc desiccation and Schmorl's nodes at multiple levels."  (*Id.* at

194-95.)  There was mild disc bulging at the L5-S1 level and disc bulging and facet hypertrophy

producing mild stenosis at the L4-L5 level.  (*Id.*)

Plaintiff was treated on October 6, 2006 for pes planus, arthritic changes of the lumbosacral spine and rheumatoid arthritis. (*Id.* at 169-170.) Dr. Gandino reported on examination that Plaintiff had equinovarus[5] deformities and hammer toes and showed bilateral ankle pronation. Dr. Gandino noted that Plaintiff needed new ankle-foot orthotics and requested a rheumatological consult. (*Id.*)

On October 6, 2006 an x-ray of Plaintiff's feet revealed exostosis of the left first metatarsal medially. (*Id.*)

On November 16, 2006, Plaintiff complained of pain in his lower back and ankles and was referred to the physical medicine and rehabilitation clinic. (*Id.* at 171-72.)

On December 26, 2006, Plaintiff complained of pain and numbness in his ankles and stated that he had been in pain for two days with relief from Naprosyn. (*Id.* at 167-68.) The examiner questioned whether Plaintiff had rheumatoid arthritis, noting that the only clinical evidence was collapsed arches. (*Id.*) Plaintiff was referred to the orthopedic clinic for hand and wrist x-rays. (*Id.*)

On December 26, 2006 an x-ray of Plaintiff's wrists showed bilateral symmetric narrowing of the radiocarpal joints, an abnormally short middle phalangeal joint in the fifth finger and bilateral vulgus deviation of the second proximal interphalangeal joint. (*Id.* at 198.)

On January 29, 2007, Dr. Gandino reported that Plaintiff had bilateral pes planus

---

[5]"Equinovarus deformity or talipes equinovarus, is a form of clubfoot in which the heel is turned inward and the foot is plantar flexed, with the inner border of the foot being supinated and the anterior part of the foot being adducted. Equinovarus deformity associated with hindfoot varus deformity constitutes the classic clubfoot pattern." *See* http://www.medcyclopaedia.com/ library/topics/volume_iii_1/e/equinovarus_deformity.aspx.

equinovarus deformities and calcaneal valgus[6] due to rheumatoid arthritis. (*Id.* at 201.) Dr. Gandino advised that Plaintiff was being followed by the rheumatology clinic for further management and needed new braces made for his legs due to the deformities caused by the arthritis. (*Id.* )

On March 20, 2007, Plaintiff complained of chronic pain in his lower back and bilateral ankles, and the following day he had a follow-up at the adult clinic. (*Id.* at 164-65.) Plaintiff reported joint pain in his ankles and lower back, morning stiffness, numbness and tingling in his legs after prolonged sitting. (*Id.* at 165.) Examination of his wrists showed symmetric narrowing of the radiocarpal bones of the hands and a bilateral valgus deviation of the second proximal interphalangeal joints. (*Id.*) Plaintiff tested positive for rheumatoid factor but there was no evidence of active bilateral symmetric changes. (*Id.*) Plaintiff was referred to the orthospine clinic. (*Id.* at 166.)

A follow-up examination on May 15, 2007 showed low back pain and polyarthralgias, but there was no evidence of rheumatoid arthritis. (*Id.* at 162-63.) Plaintiff was advised to continue taking Tylenol and was referred to the orthopedist/spine clinic. (*Id.*)

On May 15, 2007, an x-ray of Plaintiff's wrists revealed no fracture or dislocation and no significant abnormality. (*Id.* at 199-200.)

### 3. *Physical Therapist Babu S. Moses*

On July 11, 2007, Plaintiff had an initial evaluation with physical therapist, Mr. Moses. (*Id.* at 210-13.) Mr. Moses reported that flexion of the lumbar spine was limited to 35 degrees and extension to 30; lumbar spine strength was measured as a "3" on a scale from one to

---

[6]The bending or twisting outward of the heel bone. *Dorland's*, 270, 2003.

five; and Lasegue testing (*i.e.*, hamstring tightness) and Trendelenburg testing (*i.e.,* weakness of the gluteus medius muscle) was positive. (*Id.* at 212.) He noted that Plaintiff had "severe pain in the lumbar region," edema was present, balance was poor, and muscle spasms were present and "severe." (*Id.* at 209, 213.)

Mr. Moses noted on July 17, 2007, that Plaintiff had impaired joint mobility, motor function, and muscle function due to back pain. (*Id.* at 206.) While his balance increased and pain decreased, his muscle spasms and range of motion remained unchanged and he was unable to keep up with his activities of daily living. (*Id.*)

On July 25, 2007, Mr. Moses observed that Plaintiff had slightly increasing muscle guarding upon palpation with severe tenderness. (*Id.* at 205.) Although he reported slow improvement, Mr. Moses noted that Plaintiff continued with an antalgic gait. (*Id.*) Plaintiff reported that while the pain had decreased since starting physical therapy, he still had continued moderate pain in his lower back, radiating to the right and left sides and was unable to keep up with his activities of daily living. (*Id.*)

Mr. Moses reported on August 29, 2007, that Plaintiff continued to complain of pain in the lower back, but on palpatation, tenderness was reduced from severe to moderate. (*Id.* at 204.) Plaintiff was unable to stand for more than ten minutes, but had improvements in his range of motion and his ability to walk on uneven terrain. (*Id.*)

On September 5, 2007, Mr. Moses stated that Plaintiff's balance increased and his muscle spasms decreased, but his range of motion had decreased, and his pain in the lower back as well as the tenderness of the lumbar spine had increased from moderate to severe. (*Id.* at 203.) Plaintiff was again unable to stand more than ten minutes and had moderate difficulty performing

activities of daily living.  (*Id.*)

Mr. Moses noted on September 12, 2007, that Plaintiff continued to complain of pain in the lower extremities and reported that the pain exaggerated during ambulation.  (*Id.* at 202.)  He also complained of stiffness in the lower back and stated that he had moderate difficulties performing activities of daily living, including bed mobility.  (*Id.*)

### 4. *Dr. Juan Ledon - Board Certified in Physical Medicine and Rehabilitation*

The record reveals that Dr. Ledon examined Plaintiff on July 16, 2007.  (Tr. at 222.)  Plaintiff had reported pain in the bilateral side of his lower back which had began six months ago and had persisted.  (*Id.*)  Plaintiff also complained of numbness and tingling sensations to the lateral bilateral leg and foot, which was exacerbated by standing and walking. (*Id.*)  He reported that the pain was partially relieved by resting.  (*Id.*)  Plaintiff also complained of pain in the anterior bilateral ankles, which was aggravated by standing, and he reported that he had a prior history of rheumatoid arthritis.  (*Id.*)  Dr. Ledon noted that an MRI of Plaintiff's lumbar spine taken on July 22, 2006 indicated degenerative disc disease, a bulging disc, and mild stenosis in the lumbosacral spine.  (*Id.* at 223.)

On examination of the lumbar spine, Dr. Shimkus reported that Plaintiff had tenderness to palpation on the bilateral sacral sulcus and paraspinal muscles.  (*Id.*)  Active and passive ranges of motion revealed limitation on flexion and extension due to pain.  (*Id.*)  Flexion was limited to 10 degrees; knee and Achilles reflexes were graded at 2/4 bilaterally; straight leg raising was positive at 50 degrees; modified straight leg raising test was negative; and a sustained full leg raising test was positive in both legs. (*Id.*)  Dr. Ledo's diagnostic impression was lumbar spinal stenosis and degenerative disc disease and disc bulging at L5-S1 and L4-L5.  (*Id.*)  He

recommended that plaintiff continue with physical therapy and prescribed Relafen and Roboxin. (*Id.*)

Dr. Ledon reevaluated Plaintiff on August 8, 2007. (*Id.* at 224.) Despite physical therapy and medication, Plaintiff's complaints of pain persisted. (*Id.*) X-rays of the lumbar spine taken on August 4, 2007 revealed mild disc space narrowing at L4-L5 and L5-S1. (*Id.*) Examination of the lumbar spine indicated tenderness at palpation of the paraspinal muscles. (*Id.*) Forward flexion of the lumbar spine was measured to 50 degrees; straight leg raising and sustained leg raising were again positive bilaterally and the modified straight leg raising test was again negative. (*Id.*) Dr. Ledo's diagnostic impression was again lumbar spinal stenosis and degenerative disc disease and disc bulging at L5-S1 and L4-L5. (*Id.*) He advised Plaintiff to continue with physical therapy, prescribed Mobic and Flexeryl, and recommended that if the symptoms persisted, Plaintiff have a repeat lumbar MRI. (*Id.*)

On October 1, 2007, Dr. Ledon completed a medical statement of Plaintiff's abilities and limitations for his social security claim. (*Id.* at 214-19.) In the report, Dr. Ledon stated that he was treating Plaintiff on a monthly basis for lumbar stenosis at L5-S1 and a bulging disc with facet joint degenerative joint disease at L4-L5, and had prescribed Mobic and Flexeril. (*Id.* at 214.) Based on his clinical evaluation and test findings, Dr. Ledon assessed that Plaintiff could work in a competitive employment situation for four hours a day; could sit for up to thirty minutes at a time, after which he would need to alternate his posture for fifteen minutes; could perform three hours of sitting during an eight hour workday; could stand and walk for up to thirty minutes, after which he would need to sit for fifteen minutes; and could stand and walk for a total of three hours in an eight hour work day. (*Id.* at 214-16.) In addition, Dr. Ledon estimated that

Plaintiff could lift and carry between six and ten pounds occasionally and one to five pounds frequently.  (*Id.* at 216.)  With respect to Plaintiff's postural and manipulative limitations, Dr. Ledon stated that Plaintiff could only occasionally stoop and bend, and could frequently balance, perform fine and gross manipulation of the hands bilaterally, and could raise both upper extremities over the shoulder level.  (*Id.* at 217.)  Dr. Ledon noted the Plaintiff's environmental limitations prevented him from working with dangerous equipment or operating a motor vehicle, and he reported that Plaintiff could never tolerate heat, cold, dust, smoke, fumes and/or noise. (*Id.*)  As a result of his impairments, Dr. Ledon estimated that Plaintiff would likely be absent from work approximately three days a month.  (*Id.* at 218.)

In a separate medical report, dated October 1, 2007, for the Nassau County Department of Social Services, Dr. Ledon reported that Plaintiff could perform work at a level for "less than sedentary work," which was defined as work which required less than two hours a day of standing and walking, less than six hours a day of sitting and occasionally lifting less than ten pounds.  (*Id.* at 220-21.)

### 5. *Dr. Robert Drazic - Orthopedist*

Dr. Drazic examined Plaintiff on July 27, 2007, and noted that Plaintiff had a history of chronic lower back discomfort as well as bilateral feet weakness.  (*Id.* at 228.) Examination of the lumbar spine revealed mild decreased range of motion on flexion, extension, side bending and rotation.  (*Id.*)  He observed positive muscle tightness, but no paravertebral muscle spasms.  (*Id.*)  Strength of the lower extremities was a grade 4+ to 5-/5 and reflexes were 1/4 in the patellar and Achilles tendons.  (*Id.* at 110-11.)  While no palpable deformities of the Achilles tendon was noted, Dr. Ledon reported that Plaintiff had decreased sensation in his

bilateral feet and that he had difficulty walking on toes and heels and performing a deep knee bend. (*Id.*) Dr. Drazic's impression was lumbar spine sprain with a history of rheumatoid arthritis. (*Id.*)

On a follow-up visit on August 10, 2007, Dr. Drazic reevaluated Plaintiff. (*Id.* at 227.) Findings on examination of the lumbar spine remained unchanged. (*Id.*) Dr. Drazic noted that on examination of the lower extremities, Plaintiff was able to toe walk, heel walk and perform a single leg deep knee bend. (*Id.*) Strength of the lower extremities remained unchanged and reflexes were 1 to 2/4 in the patellar and Achilles tendons. (*Id.*) Dr. Drazic's impression remained the same and he advised Plaintiff to continue physical therapy, which Plaintiff indicated had helped his symptoms. (*Id.*)

In a medical report, dated August 10, 2007, for the Nassau County Department of Social Services Dr. Drazic reported that Plaintiff was not employable for any type of work due to persistent pain of the back, ankles and hip. (*Id.* at 225-26.) He indicated that Plaintiff could perform work at a level for "less than sedentary work." (*Id.*)

### 6. *The Center for Rapid Recovery (the "Center")*

Pursuant to a request from the New York State Office of Temporary and Disability Assistance Division of Disability Determination about Plaintiff, social worker Danita Wright reported by letter dated October 17, 2006, that Plaintiff had been a client at the Center since his release from prison in August 2006. (*Id.* at 124.) She stated that the focus of treatment was drug abuse relapse prevention and that he had consistently provided negative urine samples. (*Id.*)

On January 31, 2007, at the request of the Nassau County Department of Social Services, Ms. Wright completed an alcohol/drug determination and employability assessment.

14

(*Id.* at 158-61.)   She reported that Plaintiff was not able to be involved in employment related activities because he was in treatment and experiencing health concerns.  (*Id.* at 161.)

### C.   *Medical Evidence/Non-Treating Consultants*

#### 1.   *Jerome Caiati, M.D. - State Agency Medical Consultant*

On August 30, 2006, Dr. Caiati conducted an internal medicine consultative examination at the request of the New York State Division of Disability Determination.  (*Id.* at 115-18.)  Plaintiff's medical history included a bilateral bunionectomy in 1993, and a right spermatocelectomy in 2006.  (*Id.* at 115.)  In 1999, he developed lower back pain and fallen arches of the feet, and in 2004 he developed left shoulder pain.  (*Id.*)  Plaintiff reported that he began using cocaine in 1996 and stopped in 1998.  (*Id.* at 115-16.)   His daily activities included cooking, cleaning, shopping, doing the laundry, bathing and dressing independently, and he watches television, listens to the radio and socializes with friends.  (*Id.* at 116.)

On examination, Plaintiff was five feet seven inches and weighed 210 pounds.  Dr. Caiati reported Plaintiff's gait had a minimal limp on the right, he duck walked, could walk on heels and toes with moderate difficulty, could perform a full squat holding on to the table and had a normal stance.  (*Id.*)   He noted that Plaintiff used bilateral ankle bracelets for pain "all the time," and observed that his gait with or without the bracelets remained unchanged.  (*Id.*) Plaintiff needed no help changing for the examination or getting on/off the examination table, and was able to rise from a chair without difficulty.  (*Id.*)

Examination of the lumbar spine revealed flexion at 100 degrees, extension to 30 degrees, lateral flexion to 30 degrees and rotary movement to 70 degrees.  (*Id.* at 117.)  Straight leg raising was negative bilaterally to 90 degrees, range of right and left hip motion was flexion to

100 degrees, internal rotation to 80 degrees, and external rotation to 90 degrees. (*Id*.) Plaintiff showed full range of motion of the shoulders, elbows, forearms and wrists bilaterally, and strength was full in the upper and lower extremities. (*Id*.) Range of right and left ankle motion dorsiflexion was to 20 degrees, planter flexion to 40 degrees, and there was no evidence of subluxations, contractures, ankylosis or thickening. (*Id.*) Dr. Caiata noted that Plaintiff's joints were stable and non-tender and observed no redness, heat effusion, swelling, cyanosis, clubbing or edema. (*Id*.) He reported bilateral fallen arches on the feet, but noted that Plaintiff's hand and finger dexterity were intact. (*Id.*) Neurologically, he stated that the deep tendon reflexes were physiologic and equal in the upper and lower extremities and noted the absence of motor or sensory deficits and muscle atrophy. (*Id*.)

X-rays performed on August 30, 2006 of the lumbosacral spine indicated disc space narrowing and straightening of the lordotic curve, and x-rays of the right foot and toes were unremarkable. (*Id.* at 117, 123.)

Dr. Caiata's diagnoses were obesity, bilateral bunionectomy, right spermatocelectomy, left shoulder pain with full range of motion on physical examination and no full diagnosis, arthritis lumbosacral spine, fallen arches and history of cocaine abuse. (*Id.* at 118.) Dr. Caiata assessed that due to his fallen arches of the feet, Plaintiff had walking, climbing, lifting minimal limitations but found no such limitations for sitting, standing, bending, reaching, pushing or pulling. (*Id.*)

### 2. *Kathleen Acer, PH.D. - Psychologist*

On August 30, 2006, Dr. Acer conducted a psychiatric consultative evaluation at the request of the New York State Division of Disability Determination. (*Id.* at 119.) Her

medical source statement indicated that with regard to his vocational capacities, Plaintiff was able to follow and understand directions and instructions, could appropriately perform tasks and interact with others, maintain attention and concentration, make appropriate decisions, and adequately relate with others and deal with stress. (*Id*. at 121.) She indicated that the results of the examination did not appear to be consistent with any psychiatric problems that would significantly interfere with Plaintiff's ability to function on a daily basis. (*Id.*) She diagnosed only cocaine abuse in full, sustained remission and recommended that he continue with his current drug treatment program. (*Id.*)

### 3. *Dr. Anand Prachi, Board Certified in Rheumatology*

Dr. Prachi examined Plaintiff on March 20, 2007, and completed a medical report for determination of disability/employability for Nassau County Department of Social Services. (*Id*. at 156-57.) His diagnosis was chronic low back pain secondary to Scheurman's Disease.[7] On examination, Dr. Prachi reported positive findings as to pes planus and the limited flexion of the spine. (*Id*. at 156.) He was unable to fully assess Plaintiff's employability and noted that he was referred to an orthopedic specialist for further management. (*Id.*) Dr. Prachi indicated Plaintiff could perform sedentary work and could perform low-weight bearing activities. (*Id.*)

### 4. *Shawn A. Sosnick, Chiropractor*

Dr. Sosnick examined Plaintiff on May 14, 2007, and completed a medical report for determination of disability/employability for Nassau County Department of Social Services. (*Id*. at 154-55.) Dr. Sosnick's diagnoses were lumbosacral disc disease and rheumatoid arthritis,

---

[7]Scheurman's Disease is ostochondrosis beginning in childhood as a degeneration or necrosis, followed by regeneration or recalcification, of the vertebrae. *Dorland's,* 1353, 1663.

based on his findings of weakness in both legs and bulging discs. (*Id.* at 154.) He assessed that in terms of work activities, Plaintiff could lift under ten pounds occasionally, stand and/or walk two hours in an eight-hour work day; sit six hours in an eight-hour work day, and could not sit, stand or walk for twenty minutes consecutively. (*Id.* at 154-55.) Dr. Sosnick noted that Plaintiff had severe rheumatoid arthritis affecting both feet, hands, spine and shoulders. (*Id.*) He reported that Plaintiff was totally disabled since 1999 and that at the present time he was not employable for any type of work. (*Id.*)

## DISCUSSION

### I.    Standard of Review

#### A.    Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart,* 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted). Thus the only

issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability benefits prior to February 7, 2006 was "based on legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77.

### B.     *Eligibility for Disability Benefits*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform

> his past work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)).

The claimant bears the burden of proof at steps one through four, while the burden shifts to the

Commissioner at step five to show that the claimant is capable of working. *Green-Younger v.*

*Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

## II.     *Application of the Governing Law to the Present Case*

### A.     *The ALJ's Decision*

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ

found that Plaintiff had satisfied the first two steps, to wit: (1) Plaintiff had not engaged in

substantial gainful activity since August 3, 2006; and (2) Plaintiff had severe impairments of

rheumatoid arthritis, lumbar strain, depression, drug dependence, and bulging discs at the L4-L5

and L4-S1 levels.  (Tr. at 13-14.)  The ALJ concluded that Plaintiff did not meet the third step,

however, because his impairments neither met nor equaled in severity any impairment in the

Listing of Impairments, Appendix 1, Subpart P, Part 404 of the Regulations.  (Id. at 15.)  Because

the ALJ found that Plaintiff's ailments did not qualify as a per se disability under the listings, the

ALJ went on to analyze the fourth factor, i.e., whether Plaintiff's impairments precluded

performance of his past relevant work.  The ALJ found that Plaintiff had no past relevant work,

but concluded that Plaintiff had the residual functional capacity to perform the full range of

sedentary work.  (*Id.* at 15-17.)  The ALJ then proceeded to the fifth step of the analysis to

consider, based on Plaintiff's vocation factors of age and education, along with his residual

functional capacity for sedentary work, whether the Commissioner had established that there was

other work Plaintiff could have performed.  (*Id.* at 17.)   In this regard, the ALJ found that despite

Plaintiff's impairments, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (*Id.*) Thus, the ALJ found that Plaintiff was not disabled under the SSA. (*Id.* at 17-18.)

### B.    Plaintiff's Arguments

Plaintiff asserts the following two arguments in support of his contention that the ALJ's decision should be overturned: (1) the ALJ failed to give controlling weight to the medical opinion of Plaintiff's treating physicians, Dr. Ledon and Dr. Drazic; and (2) the ALJ did not adequately consider Plaintiff's subjective complaints. The Court will address Plaintiff's arguments in turn.

### C.    The Treating Physician Rule

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa,* 168 F.3d at 78-79.[8] The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts." *Halloran,* 362 F.3d at 32; *see also Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir. 2002). When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the

---

[8] "Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502.

opinion." *Halloran,* 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).  These factors include:

(1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the

treating physician's opinion; (3) consistency of the opinion with the entirety of the record;

(4) whether the treating physician is a specialist; and (5) other factors that are brought to the

attention of the Social Security Administration that tend to support or contradict the opinion.  *Id.*

§ 404.1527(d)(2)(i-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32.  Furthermore, when giving

the treating physician's opinion less than controlling weight, the ALJ must provide the claimant

with good reasons for doing so.  20 C.F.R. § 404.1527(d)(2).

### D.    *Application to the Present Case*

### 1.    *Plaintiff's Functional Abilities and the Treating Physician Rule*

Plaintiff argues that in determining his residual functional capacity, the ALJ failed

to give controlling weight to the opinions of Plaintiff's treating physicians, viz. Drs. Drazic and

Ledon.  For the reasons stated below, the Court finds that the ALJ failed to adequately set forth

his reasons for discounting the opinions of the treating physicians.

The ALJ found that Plaintiff had the following severe impairments: bulging discs

at L4-5 and L5-S1, rheumatoid arthritis, lumbar strain, depression and drug dependence.  (Tr. At

13.)  Notwithstanding this finding, the ALJ found that Plaintiff had the residual functional

capacity to perform the full range of sedentary work.[9]  In making this determination, the ALJ

described the treating physicians' findings as follows:

Robert Drazic, D.O. treated the claimant from July 27, 2007 to

_____

[9]According to the SSA, sedentary work generally involves lifting no more than ten
pounds at a time, and two hours of standing or walking and six hours of sitting in an eight hour
work day.  SSR 83-10 (Nov. 30, 1982).

August 10, 2007 and reported that the claimant had chronic low back discomfort as well as bilateral foot weakness and mild decreased range of motion of the lumbar spine with positive muscle tightness. Lower extremity strength was 4+-5-/5 in the hips, knees, ankles and toes, reflexes were 2/4 in the patella and Achilles and straight leg raising was approximately 45+ degrees with mild discomfort. Dr. Drazic stated that the claimant had persistent pain in the back, ankles, and hip and could perform less than sedentary work. In a residual capacity assessment the doctor noted that the claimant could lift less than ten pounds occasionally, stand/walk less than two hours/day, sit for less than six hours/day and could not concentrate long enough to complete a work task. The doctor diagnosed a lumbar spine sprain/strain.

. . . .

The claimant received treatment from Dr. Juan L. Ledon from July 16, 2007 to October 15, 2007 who reported that the claimant's impairment had lasted or could be expected to last 12 months and that he could work four hours per day in competitive employment. In a residual functional capacity assessment, Dr. Ledon stated that during the course of an eight-hour workday, the claimant could sit for three hours, stand/walk for three hours, lift/carry five pounds frequently and ten pounds occasionally, never work around dangerous machinery, operate a motor vehicle, tolerate heat, cold, dust, smoke, fumes or noise exposure. In addition, the doctor opined that the claimant would likely be absent from work three times a month as a result of his impairment or treatment and that his pain was five-six out of ten with ten being the worse [sic]. At the hearing the claimant testified that Dr. Ledo told him that there was a 50-50 chance of becoming paralyzed if he received injection treatment to his back. On October 15, 2007 the doctor submitted a statement wherein he stated that the claimant was told that spinal injections would be beneficial in improving his medical condition and that because of the chronic nature of his lumbar spine condition, lumbar spine injections had a 50% chance of relieving his pain.

(*Id.* at 14-15.)

Despite the fact that both treating physicians found that Plaintiff could not perform sedentary work, the ALJ failed to give their opinions controlling weight and concluded that

Plaintiff "has the full residual functional capacity to perform the full range of sedentary work."

(*Id.* at 15.)  In reaching this conclusion, the ALJ explained in one paragraph:

> At the hearing the claimant testified that Dr. Ledon informed him
> that he had a 50% chance of becoming paralyzed if he received
> spinal injections but the doctor had informed the claimant that the
> spinal injections would be beneficial in improving his medical
> condition as they had a 50% chance of relieving his pain.  The
> doctor did not indicate any paralysis but instead offered a 50%
> chance . . . of alleviating the claimant's pain.  The claimant's
> physicians, Dr. Ledon and Dr. Drazic submitted residual functional
> capacity assessments wherein they reported that the claimant could
> perform less than sedentary work but the claimant testified that he
> could lift ten pounds and could walk three to four blocks on a bad
> day.  Dr. Drazic reported on August 10, 2007 that the claimant's
> MRI of the lumbar spine revealed only mild disc bulging and that
> he had negative EMG studies in addition to reporting that the
> claimant's physical therapy was helping his symptoms.  The
> claimant reported to his physical therapist that his pain was
> exaggerated on ambulation and he had moderate difficulties
> performing activities of daily living and bed activities and transfers.
> The physical therapist reported that the claimant's balance and
> range of motion had increased and muscle spasm and pain had
> increased but reported to Dr. Drazic that his physical therapy was
> helping.  In addition, when examined by Dr. Caiati in consultation
> to the Administration of August 30, 2006 the doctor reported only
> minimal limitations in walking, climbing and lifting due to fallen
> arches.  Additionally, Dr. Acer examined the claimant in
> consultation to the Administration on August 30, 2006 and reported
> a normal psychiatric examination.

(*Id.* at 16-17.)

It was the Commissioner's burden to demonstrate that Plaintiff retained the

functional capacity to perform a range of sedentary work.  Here, the record reveals two treating

physicians reporting that Plaintiff could not perform sedentary work and one state agency medical

consultant indicating that Plaintiff had only minimal limitations in walking, climbing and lifting

and no limitations in sitting and standing.  Although the ALJ failed to afford the treating

physicians' opinions controlling weight, it is unclear on the face on the ALJ's opinion whether the ALJ considered, or was even aware of, the applicability of the treating physician rule as the decision makes no reference to the rule nor to the relevant factors that *must* be considered thereunder. For example, the ALJ did not discuss the length, nature and extent of the treating relationships, the evidence in support thereof, or the consistency of the opinions with the entirety of the record. Instead, the ALJ relies on Plaintiff's testimony that he is able to walk three to four blocks a day. Plaintiff's testimony, however, can hardly be said to reflect the capacity to perform the full range of sedentary work, which generally involves the ability to stand or walk for two hours and to sit for six hours in an eight hour work day. SSR 83-10 (Nov. 30, 1982). Moreover, although the ALJ notes that Dr. Drazic reported that Plaintiff had only mild disc bulging, in fact, Dr. Drazic noted – and the relevant MRI reflects – both mild disc bulging (L5-S1) *and* disc bulging (L4-L5).

In short, because the ALJ's decision is deficient with respect to the treating physician rule as it related to Drs. Ledon and Drazic, the Court finds that the matter must be remanded to allow the ALJ to clarify his reasons for assigning limited weight to Plaintiff's treating physicians. *See, e.g., Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physicians' opinion and we will continue remanding when we encounter opinion ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion") (internal quotation marks and citation omitted); *Schaal v. Apfel*, 134 F.3d 496, 503-05 (2d Cir. 1998); *see Kugielska v. Astrue*, 2007 WL 3052204, at *8 (S.D.N.Y. Oct. 16, 2007) ("In assessing an ALJ's legal error, the Second Circuit has remanded when the determination was

made based on a clearly erroneous standard, or when the legal standard applied was not entirely clear and the required statement of valid reasons for not crediting the opinion of plaintiff's treating physician was not contained in the ALJ's written determination.") (internal quotation marks and citations omitted).

### 2.    *Plaintiff's Subjective Complaints*

Plaintiff contends that the ALJ failed to properly assess Plaintiff's subjective complaints.  The Court agrees.

Social Security regulations require an ALJ to consider a claimant's subjective testimony regarding his symptoms in determining whether he is disabled.  *See* 20 C.F.R. § 404.1529(a).  An ALJ should compare subjective testimony regarding the frequency and severity of symptoms to objective medical evidence.  *Id.* § 404.1529(b).  If a claimant's subjective evidence of pain is supported by objective medical evidence, it is entitled to "great weight." *Simmons v. United States R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992).  However, if a claimant's symptoms suggest a greater severity of impairment than can be demonstrated by the objective medical evidence, additional factors must be considered.  *See* 20 C.F.R. § 404.1529(c)(3).  These include daily activities, the location, duration, frequency and intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms.  *Id.*

In addition, SSR 96-7p provides in pertinent part:

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the

finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p (July 2, 1996).  Absent such findings, a remand is required.  *See, e.g.*, *Schultz v. Astrue*, No. 04-CV-1369, 2008 WL 728925, at *12 (N.D.N.Y. Mar. 18, 2008).

Here, the ALJ set forth the relevant law in analyzing a claimant's symptoms and listed the relevant factors.  He then stated:

> The claimant testified that he wears braces on his back and legs for pain since 1999 but . . . he did not wear them to the hearing.  He stated that he was in jail until August 2006 where he cleaned sinks and toilets for a number of years and did clerical work for two years.  In addition, he testified that he is able to bathe, brush his hair, dress, buckle, sip, button, does his laundry, sweeps occasionally, cleans his room, make his bed, cooks, and wash dishes.  He has the ability to manage stairs, visit friends and relatives, do simple things on the computer, talk on the phone, take public transportation and drive occasionally.  He testified that he can walk three to four blocks on a bad day and does not use a cane and can lift ten pounds.

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(Tr. at 16.)

The Court finds that notwithstanding the traditional deference given an ALJ with respect to evaluating credibility, *see Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984), the ALJ's decision to disregard Plaintiff's testimony in this case is not supported by substantial evidence.  To the extent Plaintiff's reported subjective symptoms suggest a greater restriction of function than would be indicated by the medical evidence in the

record, an analysis into Plaintiff's subjective complaints was required. For example, Plaintiff

testified that he wore ankle braces on both feet everyday and back braces about three times per

week, when the pain is really bad. (Tr. at 246-47.) He said he had good days and bad days, and

on a pain scale of one through ten, a good day's pain would be about a four or five, and a bad day

about a seven or eight. (*Id.* at 248.) He said he could sit anywhere from 30 to 60 minutes (*id.* at

249), and that if he sits longer than that, his legs give out on him. (*Id.* at 250.) He testified that

physical therapy helps his pain but that an hour and a half later, his back stiffens up again. (*Id.* at

246.) He stated that he takes Flexeril (a muscle relaxant) and extra strength Tylenol for the pain.

(*Id.*) If credited, these statements could possibly support a finding that Plaintiff is disabled.

      However, the ALJ failed to consider a complete evaluation of Plaintiff's testimony

and provided little analysis of Plaintiff's subjective complaints. Instead, he stated that Plaintiff

cleaned sinks and toilets for a number of years in jail, but Plaintiff's testimony reveals that he

only cleaned three sinks and toilets. (*Id.* at 254.) The ALJ noted that Plaintiff did clerical work

while in jail but Plaintiff's testimony was that he received special treatment due to his injuries and

was excused from lifting. (*Id.* at 254-55.) The ALJ also apparently found that Plaintiff's daily

activities such as bathing, brushing his hair, dressing, cleaning his room, doing laundry, cooking,

etc, were incompatible with his Plaintiff's injuries. However, the Second Circuit has explicitly

found that an individual who engages in activities of daily living, especially when these activities

are not engaged in "for sustained periods comparable to those required to hold a sedentary job,"

may still be found to be disabled. *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir. 1998) ("'[W]hen a

disabled person gamely chooses to endure pain in order to pursue important goals,' such as

attending church and helping his wife on occasion go shopping for their family, 'it would be

shame to hold this endurance against him in determining his benefits unless his conduct truly showed that he is capable of working.'") (quoting *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989)).  Here, the ALJ failed to indicate that he considered the frequency, duration or intensity at which Plaintiff performed these activities.  In fact, Plaintiff testified for example that although he swept his room, it bothered his back to do so and therefore he swept in "spurts" and that it took him "a lot longer to clean his room than a normal person."  (*Id.* at 245.)  He also testified that he has his nephews help him with his laundry.  (*Id.* at 244.)

In sum, while the ALJ stated that he considered the factors described in the regulations for evaluating Plaintiff's symptoms, he failed to provide a thorough assessment of Plaintiff's subjective testimony regarding his ability to perform sedentary work and compare it to the objective medical evidence.  The ALJ also failed to base his decision on specific reasons which were supported by the record.  Thus, it is difficult for this Court to review his decision.  The Court therefore remands this case for a determination of Plaintiff's credibility, which must contain specific findings based upon substantial evidence in the record in a manner that enables effective review.

## III.      *The Matter is Remanded*

"Courts have declined to remand if the record shows that a finding of disability is compelled and only a calculation of benefits remains."  *Medina v. Apfel*, No. 00-CV-3940, 2001 WL 1488284, at *4 (S.D.N.Y. Nov. 21, 2001).  "Conversely, if the record would permit a conclusion by the Commissioner that the plaintiff is not disabled, the appropriate remedy is to remand for further proceedings."  *Id.* (internal quotation marks and citations omitted).  On this record, the Court cannot conclude whether Plaintiff had the residual functional capacity to

perform the full range of sedentary work during the relevant time period. Accordingly, the case is

remanded to allow the ALJ to reweigh the evidence, developing the record as may be needed.

*See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) ("When there are gaps in the administrative

record or the ALJ has applied an improper legal standard, we have, on numerous occasions,

remanded to the [Commissioner] for further development of the evidence. Remand is particularly

appropriate where, as here, we are unable to fathom the ALJ's rationale in relation to the evidence

in the record without further findings or clearer explanation for the decision.") (internal citations

and quotation marks omitted). Upon remand, the ALJ shall set forth his findings with

particularity so that the Court may adequately review the record.

### CONCLUSION

For all of the reasons stated above, the Commissioner's motion for judgment on

the pleadings is **DENIED** and Plaintiff's motion is **GRANTED** to the extent this case is

remanded for further administrative proceedings consistent with this opinion. The Clerk of the

Court is directed to close this case.

**SO ORDERED.**

Dated:    Central Islip, New York
              March 31, 2009


                                                  _____/s_____
                                                  Denis R. Hurley
                                                  United States District Judge

30